Alfred U. McKENZIE, et al., Plaintiffs,

v.

Ralph E. KENNICKELL, Jr., Defendant.

Civ. A. No. 73–0974.

United States District Court, District of Columbia.

Aug. 8, 1986.

Douglas L. Parker, Institute for Public Representation, William A. Bradford, Jr., Elliot M. Minceberg, Craig A. Hoover, Hogan & Hartson, Roderic V.C. Boggs, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Edith S. Marshall, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

On January 30, 1981, the Court entered a final relief order in this class action proceeding brought by black employees of the Offset Press Section ("OPS") of the United States Government Printing Office ("GPO"). *McKenzie v. Saylor*, 508 F.Supp. 641 (D.D.C.1981). Upheld with some modification by our Court of Appeals, *McKenzie v. Sawyer*, 684 F.2d 62 (D.C.Cir.1982), the order provided for the appointment of a Special Master to conduct proceedings to determine the amount of monetary relief, if any, due individual class members. *McKenzie v. Saylor*, 508 F.Supp. at 656. While the final relief order set out some basic principles to be followed in these *Teamsters* hearings,[1] the exact procedures

---

1. Hearings on individual relief were approved and mandated in *Teamsters v. United States*, 431

and governing standards to be employed by the Special Master were left for future consideration.

Following the Court of Appeals decision, the plaintiffs submitted a proposed order of reference to Special Master. The government's response to the proposed order raised a number of objections, many of which were accepted by the plaintiffs and incorporated in a second proposed order. Several rounds of briefs followed on the remaining disagreements between the parties. Many of the issues raised were unique and complex, made even more so by the long and sometimes tortured history of this litigation. Meanwhile, counsel for the parties engaged in unfruitful attempts to resolve and settle the litigation. In October 1985, at the request of the Court, the government submitted a proposed order.

The government has consistently suggested that the Court first resolve three major areas of disagreement and leave to further negotiation the settlement of a host of smaller, more technical issues. The first major area of dispute is whether the plaintiff class must be divided into two subclasses to reflect the fact that the administrative complaints alleging discrimination against journeymen and printing plant workers were filed at different times. The second concerns the "forward cutoff date" for the back pay proceedings; that is, the date after which vacancies in OPS may no longer be claimed as potentially available to class members. A third hotly disputed issue concerns the procedure for determining back pay for persons denied entry into training programs before 1972. Specifically, the parties disagree on how the proposed order should implement the Court's finding that GPO's consistent use of the predominately white Letterpress Transfer Program rather than the Offset Press Assistant Trainee Program to fill journeymen vacancies was discriminatory.

At this date, the parties still have not yet reached a resolution of their differences.

U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and are generally referred to as *"Teamsters*

The delay in this matter has been costly to all parties, and given the need of the plaintiffs to receive the fruits of their successful challenge of GPO's hiring and promotion practices and procedures as set out in the earlier opinions of this Court and the Court of Appeals, it serves no useful purpose to delay further the initiation of the *Teamsters* hearings. Therefore, an order of reference will be entered in full based on careful consideration of the proposals and briefs of both parties. A discussion of the reasons for the resolution of the major areas of disagreement follows.

**A.**

Under our Circuit's ruling in *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976), only class members who could have filed a timely administrative complaint at the time that the class representative did so, are eligible for back pay relief. The government argues that the plaintiff class must therefore be divided into two subclasses to reflect the fact that the McKenzie complaint, alleging discriminatory treatment of his efforts to be promoted from his journeyman position to a supervisory post, was filed on March 12, 1973, while the Ross complaint, concerning his failure to be promoted *to* the journeyman level, was not filed until July 23, 1973. According to this reasoning, printing plant workers who left GPO before June 23, 1973 are ineligible for individual relief, while journeymen only need to have been employed as of February 10, 1973. The division into subclasses would also affect the amount of monetary relief available to individual class members because back pay can be awarded only for a two-year period preceding the filing of the administrative complaint.

Throughout its review of the Court's 1977 order granting summary judgment, the Court of Appeals consistently treated March 12, 1973 as the date of the filing of the administrative complaint that

hearings."

led to this case. The Court of Appeals specifically redefined the plaintiff class, based on *Laffey*, to include all past black employees who were still working at OPS as of February 10, 1973. 684 F.2d at 72 n. 8. It also specifically upheld this Court's determination of the date to which back pay recovery should reach, that is, March 12, 1971—two years before the filing of the McKenzie complaint. *Id.* at 78. The Court of Appeals was certainly aware of the different administrative complaints, but chose not to make the distinction urged by the government. As the court noted: "The genesis of the lawsuit was the McKenzie complaint." *Id.* at 68 n. 4. Furthermore, it affirmed this Court's decision to certify as one class persons seeking promotion to uprate and supervisory positions and persons desiring to become journeymen. *Id.* at 74. Accordingly, all class members employed by OPS on or after February 10, 1973 may bring individual claims for back pay.[2]

### B.

The next major controversy concerns the "forward cut-off date" for the back pay proceedings. With respect to workers seeking promotion to journeyman positions, there is no dispute. Back pay can be sought only for vacancies occurring through December 31, 1971. *See McKenzie v. Sawyer*, 684 F.2d at 74. The parties differ, however, on the forward cut-off date for uprate and supervisory positions. Plaintiffs argue that class members should be able to claim positions that became available before January 30, 1981, the date of the Court's final relief order. The government argues that the date should be January 1, 1974, since the Court's order granting summary judgment, and the Court of Appeals' review of that decision, were based on statistical evidence of discrimination only through 1973.

In granting final relief in 1981, a finding was made that the discriminatory practices condemned in 1977 had not ceased. 508 F.Supp. at 643. This finding was based on additional statistical data and the briefs and argument of both parties. Without such a finding, the extensive relief order entered at that time and approved in large part by the Court of Appeals would not have been appropriate. While it is true that the review of the summary judgment proceedings was scrupulously limited to a consideration of the record that was before this Court at the time of its 1977 decision, *see* 684 F.2d at 67–70, no such limitation was stated or implied with respect to the appropriate *relief* once liability had been established. Indeed, the Court of Appeals in specifically upholding injunctive relief, stated: "We affirm the district court's decision that sweeping changes were needed in promotion practices at OPS. At the beginning of 1981, nearly four years after the decision on liability in this case, no blacks held foreman or assistant foreman positions in OPS." 684 F.2d at 79.

■ The government cites no case that holds that in a Title VII class action relief must be limited to the period under consideration at trial or on summary judgment. Its argument consists primarily of attempting to distinguish the cases cited by the plaintiffs for the contrary proposition. The clear implication of the case law is that the period for which liability is found does not necessarily determine the period for which relief can be granted. *See Domingo v. New England Fish Co.*, 727 F.2d 1429, 1444 (9th Cir.1984) (allowing recovery for discrimination occurring after the date of the liability decision); *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 945 (10th Cir.1979) (upholding Special Master's consideration of claims arising after period scrutinized in trial court liability finding); *Powell v. Georgia Pacific Corp.*, 535 F.Supp. 713, 725–26 (W.D.Ark.1982) (ordering back pay until the date of the liability decision, although the trial ended over two years earlier); *Kyriazi v. Western Electric Co.*, 461 F.Supp. 894 (D.N.J.1978) (liability decision); *order of reference entered* 465 F.Supp. 1141, 1156 (D.N.J.1979) (back pay

---

**2.** *See* Order of Reference, introduction.

available until date of final judgment although trial concluded ten months earlier).[3]

An award of back pay is an equitable remedy that must be applied with an eye toward achieving the statutory purposes of Title VII—the eradication of discrimination and the compensation of persons who have suffered as a result of that discrimination. *See Ablemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). The forward cut-off date proposed by plaintiffs is more in keeping with these purposes than the date advocated by the defendants. It will more completely compensate individuals who have suffered as a result of GPOs discriminatory policies and practices.[4]

### C.

The final issue of major disagreement between the parties concerns the procedure for determining back pay for persons denied entry into training programs before 1972. One of the GPO's practices found to be discriminatory in the 1977 summary judgment was the consistent use of the predominantly white Letterpress Transfer Program rather than the Offset Press Assistant Trainee Program to fill journeyman vacancies. *See McKenzie v. McCormick,* 425 F.Supp. 137, 141 (D.D.C.1977). Paragraph III(B)(6) of the final relief order therefore provided that the Special Master was to consider the impact of this practice in determining the number of available trainee positions for the back pay proceedings. On the basis of interrogatory responses by the government, plaintiffs argue that the order of reference should specifically designate 22 additional training vacancies to be considered available. These positions are described by plaintiffs as vacancies in the OPS training programs that would have existed but for the GPO's discriminatory practices. Because these positions are "hypothetical," plaintiffs argue that the government's opportunity to rebut an individual class member's claim must be limited to the possibility of demonstrating, by clear and convincing evidence that the claimant would not have qualified for the training program or that a better qualified non-class member who was eligible for the program would have been selected.

The government asserts that the plaintiffs' suggested procedure on this issue impermissibly prevents it from avoiding back pay liability by demonstrating that the individual actually selected for a position was better qualified than the class claimant. *See Teamsters,* 431 U.S. at 371–72, 97 S.Ct. at 1872–73; *McKenzie v. Sawyer,* 684 F.2d at 78. It argues that it must be able to compare the qualifications of the class member to the qualifications of the letterpressman selected for the journeyman opening.

Defendant's position misses the point of the *Teamsters* requirement and of Paragraph III(B)(6). *Teamsters* held that individual hearings must be held to determine "which of the minority employees were actual victims of the company's discriminatory practices." 431 U.S. at 371–72, 97 S.Ct. at 1872–73. Hence the requirement in most cases that the government be allowed to prove that the person selected for the disputed position was better qualified than the class member seeking back pay. A black class member who wasn't hired because a white was better qualified for the position is not an "actual victim" of discrimination.

---

**3.** The government suggests that it is meaningful that the *Kyriazi* liability decision was made after a full trial rather than on summary judgment. If this fact is significant, it would seem to cut the other way. To have prevailed on summary judgment, "the plaintiffs' case needed to have been overwhelming." *McKenzie v. Sawyer,* 684 F.2d at 72.

**4.** *See* Order of Reference, ¶ 1. The Court also rejects the government's argument that the standard of proof for rebuttal of individual claims for back pay should be different with respect to vacancies occurring after 1973. Except for the provision dealing with journeyman vacancies after 1971, the Court's back pay award was affirmed in its entirety by the Court of Appeals. *McKenzie v. Sawyer,* 684 F.2d at 80. That final relief order specified that "[o]n rebuttal, defendant must show any lack of entitlement by clear and convincing evidence."

The creation of hypothetical vacancies in the OPS training programs is, in fact, a necessary component of identifying "actual victims" of GPO's discriminatory practices and providing a satisfactory remedy to those victims. As the plaintiffs convincingly argued in urging the Court to add Paragraph III(B)(6) to the relief order, the practice of selecting workers from the Letterpress Transfer Program to fill journeyman openings had the effect not only of preventing blacks from the other programs from filling those positions, but also of artificially limiting the number of openings in the training programs themselves. Paragraph III(B)(6), as made more specific by the plaintiffs' proposed order of reference, is intended to remedy this effect of the discrimination found by the Court.

■ It is essential to remember that these hypothetical positions are *training* program positions, not the 22 journeyman positions that the workers in the Letterpress Transfer Program filled. Thus, the government can not be permitted to rebut a class member's claim to one of these positions by relying on the qualifications of a letterpressman who was not eligible for the training position at all. In fact, no *actual* selectee's qualifications are relevant with respect to these 22 positions, since the positions were never made available due to GPO's discriminatory practices.[5]

### D.

Another issue, while not identified as "major" by the parties, seems worthy of mention, namely, attorneys' fees for counsel representing individual class members in the *Teamsters* hearings. While the government's proposed order of reference leaves the question of attorneys' fees to be decided by the Special Master at the conclu-

sion of each individual hearing, it has argued strenuously in its briefs that fees should be awarded only to those individuals who ultimately are awarded back pay. It relies primarily on *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), where the Supreme Court held that time spent pursuing unsuccessful claims should not necessarily be compensated in an award of attorneys' fees to a prevailing party. Plaintiffs, in contrast, contend that all individuals who bring back pay claims should be reimbursed for their legal expenses.

■ This Court has already held that plaintiffs are the "prevailing party" in this litigation and are entitled to reasonable attorneys' fees under 42 U.S.C. § 2000e-5(k). *McKenzie v. Saylor,* 508 F.Supp. at 658. The individual hearings mandated by the final relief order and more fully outlined in the accompanying order of reference are simply the means by which individual plaintiffs are to receive the remedy due them *because* they have been successful in this class action litigation. If the plaintiffs had not succeeded on the merits, there would be no individual hearings. Thus, these hearings are not unrelated claims that should be separated from the class claims for purposes of a fee award.[6] Moreover, even unsuccessful individual claimants have benefited from the substantial injunctive relief contained in the 1981 order. Accordingly, under the order of reference, the government shall pay all attorneys' fees and costs incurred by individual claimants in the proceedings before the Special Master except where the claims are found to be frivolous or vexatious.[7]

### E.

Finally, one important issue is left unresolved by the order of reference. The

---

**5.** *See* Order of Reference, ¶¶ 7(b), 8(c). As noted above, the government can still rebut a claim based on these positions by demonstrating that a more qualified non-class member would have been selected as a trainee. *See Teamsters,* 324 U.S. at 369 n. 53, 97 S.Ct. at 1872 n. 53.

**6.** Plaintiffs' objection to the inequity that the government's position would lead to is well tak-

en. Class claims for back pay that are resolved by a lump sum payment from the defendant would lead to awards of attorneys fees for all time spent by plaintiffs' counsel in obtaining the monetary relief. Those suits that instead proceed through *Teamsters* hearings would not.

**7.** *See* Order of Reference, ¶ 15.

government asserts that no payments should be made into the Back Pay Account created by the order of reference until an individual claimant's entitlement to back pay is no longer subject to appeal. The plaintiffs are concerned with the prompt resolution of individual claims and disbursement of amounts awarded without undue delay. Neither the plaintiffs' nor the government's proposed order, however, prescribes a procedure for the review of the decisions of the Special Master by the Court.

■ The order approved today requires payments into the Back Pay Account immediately following the Special Master's decision on the entitlement of an individual claimant.[8] However, it prohibits the disbursement of funds to individual class members while an appeal that would affect those funds is still possible.[9] The parties are instructed to meet and negotiate to reach an agreement regarding appeals to this Court that will take into account the legitimate interest of the government in protecting its right to review and the legitimate interests of the class members in receiving the back pay due them as quickly as possible. By September 15, 1986, the parties shall submit a joint proposal or, if they are unable to agree, separate proposals for the consideration of the Court.

On the basis of the above, the accompanying order of reference is entered as of this date.

### ORDER OF REFERENCE TO SPECIAL MASTER

Pursuant to Rule 53(b) of the Federal Rules of Civil Procedure, this action is hereby referred to United States Magistrate Arthur L. Burnett, Jr. as Special Master to conduct proceedings to calculate the amount of back pay to be awarded to members of the plaintiff class. For purposes of these proceedings before the Special Master, the plaintiff class includes all past and present black employees of the Offset Press Section ("OPS") of the United States Government Printing Office ("GPO"), other than persons who permanently left OPS prior to February 10, 1973. The following guidelines for back pay proceedings are hereby adopted and entered to direct the conduct of those proceedings.

1. *Back Pay Periods.* Class members may present claims with respect to the selection of journeymen for promotion to uprate and supervisor positions available subsequent to August 8, 1969 and prior to January 30, 1981 (the date of the Court's Final Order granting relief), and in the selection of printing plant workers for training or promotion to journeyman positions available subsequent to August 18, 1969 and prior to January 1, 1972. However, awards of back pay shall accrue no earlier than March 12, 1971, two years prior to the filing of the initial administrative complaint in this case with the GPO.

2. *Initial Proceedings.* As an initial step, the Special Master shall conduct whatever proceedings may be necessary to determine those positions within the Offset Press Section to which promotions were made by formal application and competition (either for a training program or to the position itself), and those positions or programs filled without formal notice and application, or through other non-competitive means. In making such determination, the Special Master shall review GPO documents which set forth the criteria and procedures for promotion, such as GPO Instruction 615.2A (Federal Merit Promotion Program). Any position for which a person could be considered on the basis of nomination by an appropriate operating official shall be considered to be a position which could be filled without formal notice and application.

3. *Notice to Class Members.* Notice and claim forms have been sent out to class members pursuant to a procedure established by order of the Court.

4. *Establishment of Schedule for Claims.* Within sixty (60) days after entry

---

**8.** *See* Order of Reference, ¶ 12(a).

**9.** *See* Order of Reference ¶ 12(b)(iii).

of this Order, plaintiff class counsel shall report to the Special Master the extent to which class members have indicated that they wish to file claims for back pay, and shall propose a schedule for the presentation of those claims to the Special Master. Such schedule shall include a statement of the extent to which additional information concerning those claims is necessary, and shall propose a procedure, including additional discovery if necessary, for obtaining such information. Upon receipt of the report from plaintiff class counsel, and after consultation with defendants, the Special Master shall establish a schedule for the presentation of claims and defendant's responses for approval by the Court. Subject to the discretion of the Special Master, the defendant shall have the opportunity to obtain discovery from the plaintiffs. The Special Master shall then schedule additional proceedings on contested claims as necessary and shall have discretion to require submissions from the parties as he deems appropriate.

5. *Filing of Individual Claims.* Each claim filed before the Special Master pursuant to the schedule established in Paragraph 4 shall contain the following information:

(a) the claimant's name;

(b) for present employees, current position and pay rate; for past employees, position and pay rate as of their last date of employment at the GPO;

(c) the position or positions claimed;

(d) a statement, consistent with Paragraph 7 hereof, setting forth the basis of the claimed entitlement to the position or positions claimed; and

(e) any additional information required by the Special Master.

6. *Principles to be Applied.* In scheduling and carrying on proceedings under this order and in evaluating the adequacy of each claimant's proof, the Special Master shall apply the following principles, as established by applicable case law governing individual hearings in Title VII cases:

(a) Difficulty in ascertaining amounts due will not defeat recovery;

(b) Unreasonable exactitude, in the light of available information, will not be required;

(c) Uncertainties or doubt as to available vacancies or amounts of back pay shall be resolved against GPO.

7. *Entitlement.*

(a) To establish eligibility for back pay for training or promotions available through formal application, class members must demonstrate entitlement to back pay by showing that they applied for such training or promotion and were rejected, or by reasonably demonstrating that they were deterred from applying because of the GPO's discriminatory practices.

(b) To establish eligibility for back pay for training and promotion to positions available through informal or noncompetitive means, class members may demonstrate entitlement by showing they would have applied for the training or promotion had they known of its availability. In demonstrating that they would have applied, class members may show, among other facts:

(i) general eligibility to apply for the training or promotion by virtue of the position held by the would-be applicant at that time (e.g., journeymen applying for an uprate position);

(ii) formal application for other, similar training or promotion opportunities submitted in the same proximate time period; and/or

(iii) that the claimant notified appropriate supervisory officials of his or her interest in being considered for future opportunities.

(c) In considering claims relating to the denial of entry into training programs (including Apprenticeship Programs or Offset Press Assistant Trainee Programs), the Special Master shall consider the impact of transfers from the GPO's Letterpress Section on the vacancies in each training program and shall increase the number of positions considered to be available in each training class as appropriate. Specifically, the Special Master shall, at a minimum,

consider the training programs prior to January 1, 1972 to have had twenty-two additional vacancies. Such vacancies shall be considered to have been available as of January 12, 1970 (5 vacancies); January 26, 1970 (1 vacancy); May 1, 1970 (2 vacancies); May 29, 1970 (2 vacancies); September 7, 1970 (2 vacancies); March 19, 1971 (9 vacancies); and May 1, 1971 (1 vacancy), the dates on which transfers from Letterpress occurred. For the purposes of calculating back pay with respect to such vacancies pursuant to Paragraph 11, the Special Master shall calculate the minimum period of time within which a person who entered such a training program could have completed the program and become a journeyman pressman. Such minimum period shall be no longer than the shortest length of time any person who entered one of the above training programs prior to January 1, 1972 remained in such program before becoming a journeyman pressman.

### 8. *Rebuttal.*

(a) Defendants may rebut the entitlement of any claimant by proving (i) that the particular position applied for was filled by another black worker; (ii) that the claimant did not possess the necessary qualifications for the position or training program; (iii) that the person selected for the job was better qualified; or (iv) in the case of denial of entry into a training program, that the claimant would not have been able to complete the training program if he or she had been admitted to it at the time he or she initially applied.

(b) With respect to the twenty-two training positions discussed in Paragraph 7(c), defendants may rebut the entitlement of any claimant by proving (i) that the claimant did not possess the necessary qualifications for the training program; (ii) that the position in the training program would have been filled by a better qualified non-class member who would have been eligible and selected for such training program; or (iii) that the claimant would not have been able to complete the training program if he or she had been admitted to it at the time he or she would have initially applied.

(c) In all cases, the qualifications to be applied are to be no more stringent than those actually applied to any white employee promoted to the position in question or admitted to the training program. Further, supervisory evaluations and test scores shall not in and of themselves constitute clear and convincing evidence of superior qualification, and GPO shall be responsible for demonstrating that any qualifications, criteria or procedures were job related at the time they were used.

**9. *Burdens.*** The initial demonstration of entitlement shall be made by a preponderance of the evidence. On rebuttal, defendant must show any lack of entitlement by clear and convincing evidence.

**10. *Subsequent Promotions.*** In an appropriate case, the Special Master may consider claims for back pay based on possible promotions beyond the first level of advancement claimed. For example, should a class member assert that he was denied a journeyman position in 1970, he may also attempt to demonstrate that it is more likely than not that he would subsequently have been promoted to an uprate position.

### 11. *Calculation of Back Pay.*

(a) The amount of back pay to which an individual claimant is entitled shall be determined by subtracting the claimant's actual hourly pay rate over the back pay period from the hourly rate of the position for which the claimant has successfully shown an entitlement under the procedures described in this Order. The difference between the pay rates shall then be multiplied by the total number of hours in the back pay period. The amount determined in this manner shall be considered the claimant's "pay differential" with respect to that position. Should any changes in pay rate have occurred over the back pay period, the calculations shall be adjusted accordingly. The Special Master shall in his discretion make further adjustments in the pay differential as appropriate. For the purposes of this Order, the term "back pay period" refers, in the case of a wrongful denial of a promotion, to the interval between the date on which the position was

filled and the date on which the claimant is promoted to his or her rightful position as established before the Special Master. In the case of a wrongful denial of training opportunity, the back pay period shall run from the date on which the claimant would have completed the training program to the date on which the claimant either was offered and declined a training opportunity, the date on which the claimant successfully completed a comparable training program or was discharged from the training program; except no back or front pay shall be paid in the event that the claimant is discharged from a training program for failure to show the necessary level of competence.

(b) Any award of back pay shall include all elements of financial loss including, without limitation, retirement, disability, overtime, pension contributions, shift differentials, and vacation and sick leave pay, except that a claimant shall not be paid any back or front pay differential for time periods in a non-pay status. Pensions shall be subject to adjustment as provided in Paragraph 14 below.

### 12. *Back Pay Awards.*

(a) Upon establishment of an individual class member's entitlement to back pay and the calculation of that amount as provided in Paragraph 11 above, the GPO shall pay this amount into an account administered by the Special Master as agent for the claimant (hereinafter the Back Pay Account); *provided however*, that the GPO shall not be required to pay into the Back Pay Account any amount attributable to a vacancy for any portion of a back pay period with respect to which a payment has previously been made pursuant to this paragraph. Amounts paid into the Back Pay Account shall be separately identified by the name of the successful claimant and the particular position or vacancy upon which the calculation was based.

(b) The amounts paid into the Back Pay Account established pursuant to subparagraph (a) shall be held in such account until plaintiffs submit to the Special Master, and the Special Master in the exercise of sound discretion approves, a procedure for distributing all or part of the amount held in the Back Pay Account, including any interest earned thereon, to a group of class members. In approving any such procedure proposed by plaintiffs, the Special Master shall ensure that:

(i) no class member in the proposed group shall receive any award of back pay which, when added to his or her actual salary earned at the GPO, would cause the total amount received to exceed the salary that such person would have earned had he or she actually been promoted on the date of the first vacancy at each position for which such person has successfully claimed;

(ii) no class member in the proposed group shall receive any portion of an award of back pay allocable to any vacancy for which he or she made a claim pursuant to this Order and for which such claim was denied; and

(iii) no disbursement of funds to a class member shall occur until the establishment of entitlement by that class member is final and not subject to further appeal.

### 13. *Distribution of Front Pay Awards.*

(a) Subsequent to making the payments into the Back Pay Account provided in Paragraph 12, and at the end of each pay period thereafter, the GPO shall pay additional amounts into the Back Pay Account as calculated in accordance with this Paragraph 13.

(b) For each such pay period, the GPO shall pay to the Back Pay Account an amount, calculated as provided below, for each vacancy with respect to which one or more claims were established and for which one or more of the persons who established such claims is still employed in OPS and has not yet been promoted to a position equivalent to that successfully claimed, so long as the claimant consistently applies for all such positions as they become available. The amount paid for each quarter for each such vacancy shall be equal to the greatest pay differential established by any successful claimant applicable to such pay

period; except that no claimant shall receive more in salary and front pay than he would receive if actually in the position successfully claimed.

(c) Promptly after payment of the amount established pursuant to subparagraph (b), such amount shall be distributed among eligible class members by the Special Master pursuant to the procedure and subject to the limitations in Paragraph 12(b) above.

(d) The GPO shall continue to make payments pursuant to this Paragraph 13 until all persons who established claims have either been promoted to a position equivalent to that upon which their claims were based, are no longer employed in OPS or have rejected a valid offer of promotion or training.

14. *Adjustment of Pensions.* The GPO, based on information supplied to it by the Special Master, shall promptly report to the Office of Personnel Management any back pay paid to any class member who has retired, so that an appropriate adjustment to the annuity or other benefits payable to such class member can be made.

15. *Representation in Individual Hearings.*

(a) Representation of class members in individual hearings pursuant to this Order by counsel other than plaintiffs' class counsel shall be subject to the approval of the Special Master, who shall ensure that such counsel are competent and knowledgeable with respect to the standards and requirements for proceedings hereunder.

(b) The GPO shall pay all attorneys fees and costs incurred by plaintiffs in the above-described proceedings except with respect to any individual claim which the Special Master determines and the Court confirms was vexatious, frivolous and in bad faith. Plaintiffs shall submit an application for such fees and costs to the Special Master, who shall determine the amount to be awarded subject to the Court's approval.

16. *Status Reports to Court*

In addition to filing reports as required by Fed.R.Civ.P. 53(e), the Special Master shall advise the Court, six months from the date of this order and every three months thereafter, on the progress of the individual *Teamsters* hearings and the overall status of this proceeding.

17. *Retention of Jurisdiction.* This order is subject to amendment by the Court *sua sponte* or upon application of the parties or the Special Master. Jurisdiction of this action is retained by the Court pursuant to the provisions of Paragraph IV(E) of the Final Order of January 30, 1981.